JUSTICE TRIEWEILER
dissenting.
¶40 I dissent from the majority’s conclusion that there was substantial evidence to support the jury’s verdict that the defendant’s negligence did not cause damage to the plaintiffs.
¶41 The District Court correctly instructed the jury that “[a] doctor’s negligence is a cause of damage to the plaintiff if it causes increased risk of harm to the plaintiff or reduces his chance for obtaining a better result.” Montana Pattern Jury Instruction (Civil) 3.11; Aasheim v. Humberger (1985), 215 Mont. 127, 132, 695 P.2d 824, 827-28.
¶42 Plaintiffs contended that the defendant, C.R. Canty, M.D., was negligent by failing to adequately diagnose impairment to the blood flow through Kathe Campbell’s radial artery, and by failing to consult a specialist so that the necessary circulation of blood to her injured hand could be restored.
¶43 The evidence was that her medical records disclosed impairment to that blood flow by mid-day, June 2,1993, but that other than arranging for her transfer to Billings, nothing was done by Dr. Canty to treat that impairment, and that it was first treated by Curtis R. Settergren, M.D., more than thirty hours later. It was uncontroverted that human tissue which is denied blood for as little as four to six hours cannot survive.
¶44 Furthermore, Dr. Kenneth Wilson gave the following testimony:
Q. [APPELLANTS’ COUNSEL] Is it adequate orthopedic surgical care to simply allow the hand to remain there untreated when there’s suboptimal blood flow to the hand?
A. That’s just not acceptable.
Q. Would you explain why?
*409 A. Well, if there’s suboptimal flow and you don’t monitor it, there’s a high likelihood that the hand’s going to die.
Q. Does that high likelihood increase the opportunity for increased risk to the patient; in other words, a more severe outcome could happen to the patient?
A. No question about it.
Q. Does it — does that same problem yield a greater likelihood of having a poorer result of the hospitalization and treatment?
A. Yes.
Q. And what effect did that have on Kathe Campbell’s ability to obtain a good result during her care under Dr. Canty at St. James Community Hospital?
A. That was the major reason she ended up with a bad result.
Q. Did that failure to call in other doctors or to do the graft result in an increased chance of risk to Kathe Campbell, in your opinion?
A. Definitely.
Q. And did it also heighten the probability that she would get a worse result?
A. Yes.
Q. Now, with respect to those percentages, whether it was a 75 percent chance of a likely outcome or a 90 percent chance of a likely outcome, is it still your testimony that the likelihood of a successful outcome was reduced or eliminated by the failure to deal with the circulatory emergency that Kathe had?
A. That’s correct.
Q. And was it similarly reduced or eliminated by the failure to recognize that circulation emergency?
A. Yes.
Q. And similarly, was the likelihood of a successful outcome reduced or eliminated by the failure to monitor and to test objectively, to have orders given that would have someone do that?
A. Yes.
Q. Were those percentages similarly reduced by the failure to have some kind of handy access through the fixed fiberglass cast so that testing could, in fact, be done?
A. Yes.
*410 Q. Did that reduction in the percentage of successful outcome indicate a higher probability of harm to Kathe Campbell as a result of those inactions that Fve just listed off?
A. Most definitely.
¶45 Only three other physicians testified, Dr. Canty and Dr. Settergren, and Dr. Canty’s retained expert, Stephen R. Sears, M.D.
¶46 Dr. Canty did not testify directly on the issue of causation, as characterized by the District Court’s instruction. Neither did Dr. Sears. Nor is direct testimony from either witness on that issue cited in the majority opinion.
¶47 Dr. Settergren’s testimony is, at best, inconsistent regarding the issue of causation. At one point, when asked if an earlier bypass would have increased the likelihood of full revascularization to Kathe’s extremity, he testified that he could not say the outcome would have been different. However, that testimony did not, in substance, directly contradict the testimony on causation given by Dr. Wilson. He did testify that had Kathe’s arm been saved, it would have been substantially impaired. However, that is not the equivalent of testifying that she suffered no damage by the defendant’s failure to timely diagnose and treat her obstructed radial artery. New would disagree that a substantially impaired extremity is better than no extremity.
¶48 At another point in his testimony, however, Dr. Settergren testified that it was possible, although he could not testify that it was probable, that an amputation could have been avoided by more timely vascular treatment, and at a later point in his testimony he stated more specifically that had the bypass been done closer in time to the circulatory failure to assure better flow of blood to Kathe’s fingers, there was a chance that the tissues of the fingers could have been preserved.
¶49 Furthermore, everything about the course of Dr. Settergren’s treatment suggests that Kathe had a chance of successful treatment, had that treatment been timely. By the time she arrived in Billings, he stated that her hand had become ischemic, which meant that there was inadequate blood flow to maintain the tissue at that location. Nevertheless, even at that point, with partial necrosis of the hand apparent, he felt it was worth a try to revascularize the hand by using a bypass from the proximal radial artery (toward the elbow) to the distal artery (in the direction of her hand). He felt that some circulation could be reestablished to the hand by bypassing the area of the artery that had been injured. Dr. Settergren testified that he would not have done a bypass procedure of that type unless there was a possibility of *411 retaining the appendage. However, everyone agreed that the longer circulation is cut off to a part of the body, the less likely it is that the life of the tissue at that location can be salvaged.
¶50 The jury found that the defendant was negligent and, therefore, necessarily found that he should have diagnosed the impairment to Kathe’s circulation sooner and referred her for treatment. Based on the uncontroverted evidence regarding causation, the jury could not have found that a delay in that treatment did not at least reduce Kathe’s chance for obtaining a better result. She was required to prove nothing more.
¶51 Contrary to the implication from the majority opinion, the issue in this case was not why Dr. Settergren amputated at the level where he did, nor the degree of function that Kathe would have had in her hand, had it been saved by timely restoration of circulation. Nor was it Kathe’s contention, as suggested in the majority opinion, that lack of circulation through the radial and ulnar arteries was her only problem. Although damage to the forearm may have contributed to the level of amputation, it was Kathe’s contention that her hand was salvageable and that the amputation would not have been necessary, had her hand received timely restoration of circulation.
¶52 Finally, Dr. Canty’s testimony that he was dubious about Kathe’s chances of successful bypass surgery did not directly address the issue of causation. He was discussing his state of mind before impairment to circulation through the radial artery had even been diagnosed, and his opinion did not even directly relate to Kathe’s hand, but instead related to the condition of her forearm. Furthermore, however Dr. Canty’s observation is characterized, it was not an opinion expressed in terms of medical probability, nor did it in any other way discuss the issue of causation, as it was defined by the court. Nothing cited in the majority opinion contradicts Dr. Wilson’s testimony regarding causation.
¶53 For these reasons, I dissent from the majority opinion. After thoroughly reviewing the testimony of all medical witnesses, I conclude that there was no evidence to contradict the testimony of Dr. Wilson that the negligence of the defendant reduced Kathe Campbell’s chance for obtaining a better result. Furthermore, all of the medical principles agreed upon by the expert witnesses lead to the inevitable conclusion that the failure to treat Kathe’s loss of circulation to the then viable tissue in her hand in a timely manner led to its necrosis and the ultimate need for the amputation of her arm.